OPINION OF THE COURT
Catherine DiDomenico, J.
*943 By petitions dated March 14, 2006, June 13, 2006, July 24, 2006, and November 13, 2006 petitioners, John and Mary Rose Poppe, seek an order finding respondent, Laura Ruocco in wilful violation of an order dated December 1, 2005 (Porzio, J.) (the visitation order) that granted the Poppes visitation rights with their grandchildren, N.R. (12) and D.R. (11). (Matter of Poppe v Ruocco, 37 AD3d 608 [2d Dept 2007].) Respondent is the adoptive mother of these children. By cross petition dated May 30, 2007, respondent mother moves to vacate the visitation order. She contends that visiting with the Poppes causes the children mental anguish and emotional pain such that compelling them to visit is no longer appropriate. For the reasons set forth below, this court finds that the nearly three years that have now elapsed since implementation of the visitation order evidence that it is no longer in the best interests of these children to compel them to continue to visit with their grandparents against their wishes and the will of their mother. Accordingly, the Poppes’ petitions are dismissed and Ms. Ruocco’s cross petition is granted in its entirety.
Factual Background
This case arises out of a tragic and horrific child abuse case. On or about September 18, 2003, the Poppes’ son, M.H. and his wife J.M.H., were convicted of murdering the sibling of the subject children through depraved acts of physical abuse. The subject children were present during the acts of violence committed against their deceased sibling and at times, at least one of these children, D.R., was also a target of the abuse. Specifically, both children were home at the time their sister was drowned in the bathtub and indeed, one of these children actually found her deceased sister in that condition. There is no dispute that the subject children have been in therapy for the past several years and continue to manifest a myriad of symptoms as a result of the trauma they endured including self-defecating, anxiety, nightmares and poor hygiene. These symptoms are particularly severe in D.R.’s case. Both biological parents are presently serving lengthy prison sentences.
The subject children were remanded by Family Court and placed in Ms. Ruocco’s nonkinship foster home in November 2001. The remaining siblings were placed in another foster home. The Poppes originally filed for custody of the subject children, but withdrew their petition. On August 22, 2003, the parental rights of the Poppes’ son, M.H., and the biological mother were terminated. On June 10, 2005, Ms. Ruocco adopted *944 these children. Ms. Ruocco was the only adoptive resource for these children. By the time the adoption was finalized, the children had been living with her for more than four years. With permission of the court, one child’s name was changed to N.R.
Approximately one month later, on July 11, 2005, the Poppes moved this court for visitation with N.R. and D.R. In a written decision dated December 1, 2005, Judge Porzio granted the Poppes visitation over Ms. Ruocco’s objection. On March 14, 2006, the Poppes filed their first of several violation petitions alleging that Ms. Ruocco has failed to comply with the visitation order. On April 27, 2006, this court issued an order directing that the visitation schedule established by the visitation order be followed by all parties. The order further directed petitioners to remove reminders of the biological parents from their homes as this had been identified as a potential cause for the children’s refusal to visit pursuant to the visitation order.
Respondent mother does not seriously dispute that visitation has not occurred in accordance with the visitation order, but argues that her failure to follow the visitation order was not wilful. Specifically, respondent mother claims that the children, particularly D.R., refuse to visit because it is emotionally painful for them and causes a number of psychological and physiological symptoms to occur after, and in anticipation of, the court-ordered visits.
This case proceeded to trial on March 26, 2007, March 27, 2007, March 29, 2007, January 25, 2008, April 4, 2008 and June 2, 2008. Petitioner, Mr. Poppe, testified and called Ms. K., L.S.W. and the court-appointed forensic evaluator, Dr. L., as witnesses. Petitioners introduced the following documents into evidence: visitation schedule (petitioners’ 1); handwritten note (petitioners’ 2); letter written by Mr. M. (petitioners’ 3); Dr. L.’s curriculum vitae (petitioners’ 3A); Dr. L.’s forensic evaluation (petitioners’ 4); addendum to Dr. L.’s forensic evaluation; June 18, 2006 report by Ms. K. (petitioners’ 6); and October 13, 2005 report by Ms. K. (petitioners’ 7). Respondent mother testified and called the children’s therapists T.K., S.L. and Ms. M. Respondent mother introduced the following documents into evidence: mental health records for N.R. and D.R. (respondent’s A). On joint application of all parties, this court did not conduct an in camera of the children so as not to further traumatize them.
Mr. Poppe’s Testimony
Mr. Poppe credibly testified as to the specific visits that did not occur with D.R. because she refused to go. He further cred *945 ibly testified that many of the visits with N.R. either were cancelled or shortened either because of N.R.’s delay in acquiescing to the court-ordered visits or because respondent mother cancelled the visits outright. He believes respondent mother does not support the children visiting with them, and at times does her best to sabotage, either consciously or not, the Poppes’ visitation rights under the visitation order. He seeks an order finding respondent mother in violation of the visitation order and awarding compensatory visits.
Respondent Mother’s Testimony
Respondent mother admitted that visitation did not occur as required under the visitation order, but credibly testified as to the reasons for missed visits. She testified that pursuant to the visitation order, the Poppes had six therapeutic visits every other week for 45 minutes. When therapeutic visits ended, the children were to visit with their grandparents alone every other Friday from 3:30 to 8:00 p.m. During the months of July and August, visits were the second Friday of the month from 3:30 p.m. to 8:00 p.m. and the fourth Saturday of the month from 9:00 a.m. to 9:00 p.m. Based on the reaction she observed from her children, respondent mother believed the therapeutic “breaking in” period should have been longer and told this to the Poppes who preferred to follow the visitation order as written. Respondent mother testified that the children were having a very hard time but she tried to facilitate visits by suggesting that they do things together instead of the children being alone with the Poppes.
Respondent mother credibly testified that the behavior the children exhibited either in anticipation of, or immediately after, the court-ordered visits with the Poppes included bed wetting, self-defecating, anxiety, sleeplessness, and crying. Neither of the children wanted to attend the visits. Wfiien D.R. is anxious about an upcoming visit, she overeats. On one occasion, when told of an impending visit with the Poppes, she ate an entire box of Yodels.
In response to the Poppes’ claim that respondent mother was actively interfering with their rights under the visitation order, on August 22, 2006, this court issued an order excluding respondent mother from accompanying these children on visits with the Poppes. Respondent mother testified that, on August 26, 2006, when petitioners pulled up in the driveway, N.R. and D.R. cried hysterically. D.R. ran upstairs and refused to go on the visits. N.R. was also upset and refused to leave the house *946 without her mother. Ms. Poppe assured D.R. that if she agreed to go on the visit, she would bring her home early. After much coaxing and cajoling, D.R. agreed to go provided she was returned to her mother within two hours. Respondent mother put the children in the car, seat belted them in and closed the door. As soon as the Poppes began to drive away, D.R. became very upset and jumped out of the car. D.R. has since refused to visit with the Poppes. N.R. goes on the court-ordered visits because she does not want to see her mother get in any more trouble with the court.
Respondent mother does not believe there should be an order compelling the children to visit with the Poppes because their presence traumatizes the children and triggers painful memories of the abuse committed by their biological father. She is not against the petitioners visiting with the children when the children are ready psychologically and emotionally to seek this relationship. However, she believes they should not be forced to visit. She points out that N.R. and D.R. visit with their maternal grandparents without problem but they are not compelled by law to do so and are not embroiled in contentious litigation over the visits.
The Children’s Therapists
a. D.R.
T.K., M.S.W, testified as a fact witness. She has been D.R.’s therapist since December 2005. Ms. K. testified that D.R. is prescribed medication for anxiety, posttraumatic stress disorder and attention deficit disorder. Ms. K. testified that D.R.’s anxiety level increased after therapeutic visits with the Poppes ended and respondent mother was ordered excluded from visits. D.R. soiled herself more often when told of an upcoming visit. Ms. K. testified that she contacted the Poppes in February 2007 and asked them to remove pictures of D.R.’s siblings because it was traumatic for D.R. to see those images.
Ms. K. testified that D.R. said that the visits with the Poppes painfully remind her of her “old mommy and daddy,” and her past history of abuse. Ms. K. testified that D.R. was anxious and wet the bed after a March 7, 2008 visit with the Poppes.
b. N.R.
Ms. M., L.S.W, testified as a fact witness. Ms. M. was N.R’s therapist from 2005 until February 2007. Ms. M. testified that N.R. is treated by a psychiatrist for depression and posttraumatic stress disorder. She testified that N.R. said she doesn’t *947 enjoy visiting with the Poppes because they have in the past talked about her “old daddy.” Ms. M. testified that N.R. said that petitioners put her on the phone with her “old daddy” or the “Bad Man” and their home has pictures of him.
Ms. M. testified that N.R. is aware there is a court order and that she has to go on the visits with the Poppes so she doesn’t “get anyone in trouble.” Ms. M. testified that N.R. told her that she would be more comfortable going on the compulsory visits if her mother was also forced to go.
Ms. L., L.S.W, testified as a fact witness. Ms. L. testified that she began seeing N.R. for weekly therapy sessions in 2007. Ms. L. testified that she also sees respondent mother for collateral therapy sessions. Ms. L. testified that N.R.’s diagnosis remains posttraumatic stress disorder due to severe child abuse. Ms. L. testified that N.R. suffers from nightmares, fear and anxiety. Ms. L. testified that N.R. told her she does not want to visit with the Poppes because they remind her of her old parents. Ms. L. testified that N.R. recently became interested about her past and wanted to search for information on the Internet. N.R. used the computer in her office and searched for articles about her sister’s homicide. N.R. is afraid that her father will be released from prison one day.
The Court-Appointed Psychiatrist
Dr. L. was qualified as an expert in the areas of psychiatry and neurology, psychiatric trauma, forensic psychiatry and child and adolescent psychiatry. Dr. L. prepared a forensic evaluation for the court pursuant to an order dated June 13, 2007. Dr. L.’s evaluation consisted of individual interviews of the parties as well as several collateral sources including therapists for the children, and an observation of N.R. with the Poppes. Dr. L. was unable to observe D.R. with the Poppes because D.R. refused to be in the presence of the Poppes. Dr. L. testified that on the day he was to observe D.R. with petitioners, she “freaked out and locked herself in the bathroom.” Dr. L. testified that D.R. came out of the bathroom only after he promised this child she would not have to go anywhere with the Poppes.
Dr. L. testified that N.R. seems to be able to go on the visits and have an “okay time.” Dr. L. testified that during his observation of the visit with N.R., she was cold to the Poppes and clearly did not want to be with them.
Dr. L. credibly testified that ideally it is in all children’s best interest to have loving relationships with a variety of people in *948 their lives. If a relationship could be nurtured with the Poppes over time, then the children could be made to understand that not all their paternal biological relatives are bad. Applying these general principles, it is his opinion that D.R. and N.R. should continue to visit with the Poppes. According to Dr. L., D.R. should be given the option to visit for four to eight weeks then be compelled to do so thereafter. Dr. L. testified however, that if D.R.’s therapist says that she is getting suicidal before visits or begins self mutilating, then at that point, she should not be forced to visit.
The Initial Court-Appointed Therapist
Ms. K., L.S.W., was qualified as an expert in the field of psychotherapy and family therapy. Ms. K. prepared an evaluation for the court pursuant to an order dated April 27, 2006. Pursuant to court order, Ms. K. conducted family therapy sessions in 2005 with the Poppes, respondent mother and the subject children. During joint therapy sessions, it was agreed that no one would discuss the biological parents of the subject children.
Ms. K. testified that, based on the time spent with the parties, she believes that the relationship between the Poppes and respondent mother is so strained that “they can’t be together in the same room.” (Tr, June 2, 2008, at 167.) In her opinion, respondent mother has not given “psychological permission that the children need to go on these visits effectively.” During the first five months of therapy, all of the parties worked very hard at making the visits successful. When the criminal case against the biological parents began, the relationship between the Poppes and respondent mother deteriorated. The Poppes were reportedly devastated by the victim impact statement respondent mother delivered on behalf of the children at the sentencing portion of their son’s criminal trial. Respondent mother was similarly devastated when the Poppes filed for custody of the subject children only to withdraw their petition later. These developments only intensified the animosity and distrust between these parties.
Applicable Law
In New York, Domestic Relations Law § 72 recognizes the value of the relationship between children and grandparents, but does not create an absolute or automatic right to visitation. (Lo Presti v Lo Presti, 40 NY2d 522 [1976].) Domestic Relations Law § 72 provides a procedural mechanism for grandparents to *949 acquire standing to seek visitation with a minor grandchild in two instances (1) where one or both of the parents of the child are deceased or (2) where circumstances show that conditions exist which equity would see fit to intervene. (Matter of Emanuel S. v Joseph E., 78 NY2d 178 [1991].) In the Matter of E.S. v P.D., the Court of Appeals held New York’s grandparent visitation statute was not facially unconstitutional. (8 NY3d 150 [2007].) When grandparents file a petition for visitation, the court undertakes a two-part inquiry, first it must determine if the grandparent has standing based on death of one or both of the parents or equitable circumstances. If the court determines the grandparents have a right to be heard then it must determine if visitation is in the best interest of the child. (Matter of Emanuel S. v Joseph E., 78 NY2d 178 [1991].)
Once grandparent visitation is awarded it may only be modified upon a showing that there has been a subsequent change of circumstances and modification is required. (See Matter of Wilson v McGlinchey, 2 NY3d 375 [2004]; Family Ct Act § 467 [b] [ii].) Parties seeking modification of a visitation order need not demonstrate an extraordinary change in circumstances, rather the standard to be applied remains the best interest of the child when all of the applicable factors are considered. (Friederwitzer v Friederwitzer, 55 NY2d 89 [1982].) Factors to be considered include (1) whether the change implicates the “fitness” of one of the parties (see Aberbach v Aberbach, 33 NY2d 592 [1973]); (2) the nature and the quality of the relationship between the child and the parties (see Matter of Emanuel S., 78 NY2d 178, 181 [1991]); and (3) the existence of a prior agreement (see Eschbach v Eschbach, 56 NY2d 167 [1982]).
“[V]isits with a grandparent are often a precious part of a child’s experience and there are benefits which devolve upon the grandchild which he cannot derive from any other relationship.” (Matter of Emanuel S., 78 NY2d at 181.) That interest must yield, however, where the circumstances of the family include a deterioration in the relationship between the parent and grandparents which renders the continuation of grandparent visitation not in the best interest of the children. (See Matter of Wilson v McGlinchey, 2 NY3d 375, 382 [2004].) “It is almost too obvious to state that, in cases where grandparents must use legal procedures to obtain visitation rights, some degree of animosity exists between them and the party having custody of the child or children.” (Lo Presti u Lo Presti, 40 NY2d 522, 526 [1976].) While there can be no question that *950 under ideal circumstances children benefit from maintaining a connection with their grandparents, that benefit should not come at the cost of the children’s emotional well-being. (Matter of Smith v Smith, NYLJ, Oct. 19, 2007, at 29, col 3; Matter of Wilson v McGlinchey, 2 NY3d at 382.)
Applying these well established principles to this case, the court finds that while the Poppes have proven that visitation did not occur pursuant to the visitation order, there was no wilful violation on the part of the respondent mother requiring relief to be afforded on their violation petitions. The court further finds that respondent mother has shown that it is no longer in the children’s best interests to compel them to visit with their grandparents at this time and that there has been a sufficient change in circumstances to terminate compulsory visitation.
Although the court credits Mr. Poppe’s testimony that they do not speak about the children’s biological father and have removed all images and reminders of him and the children’s siblings from their home, the evidence demonstrates that the Poppes’ presence continues to trigger very painful memories for these children. While it is obvious that the Poppes genuinely love these children and desperately want to be a part of their lives, their desire to have a relationship with these children is far outweighed by the psychological harm and emotional turmoil caused to the children that results when they are forced to attend visits. (See Matter of Wilson v McGlinchey, 2 NY3d 375 [2004].)
When the court considers what is in the best interests of the children, there is no doubt that the court-compelled visitation must be terminated as no longer in their best interests. In reaching this conclusion, the court passes no judgment on the Poppes who, by all measure, present as loving, nurturing individuals who many children would be privileged to have as grandparents. In this particular case, however, the presence of the Poppes causes these children great distress. The effects of what these children experienced at the hands of their biological father and his wife (whose parental rights have long been terminated) are still vividly present in these children. This fact cannot be erased, and as explained by the mental health experts on this record, these children continue to associate the Poppes with their father and the depraved acts of abuse for which he now stands convicted.
In reaching the conclusion not to compel visitation any longer, this court has considered Dr. L.’s position that these chil *951 dren should engage in desensitization therapy so that they can be slowly desensitized to the reminders of the abuse and so that the memories do not take over their lives. It appears that N.R. has embarked on this therapy when, in the company of her therapist, she began reviewing media reports of her sibling’s homicide and the criminal proceedings against her parents. This court leaves it to the trained professionals currently working with D.R. to determine what is therapeutically appropriate for that child as neither party offered sufficient evidence on this record for this court to determine this issue.
This court has also considered Dr. L.’s position that, ideally, children do best when engaged in loving relationships with a whole host of adults. This ideal, however, must give way to the unfortunate reality in this case that the presence of the Poppes as compelled by the court has only added to the chaos and trauma which still plagues these children. In addition, the forced visitation has resulted in a myriad of psychological and physiological manifestations including, binge eating, bed wetting and self-defecating.
The court has also considered the Law Guardian’s consistent position at trial that neither one of these children wants to be forced to visit. In his written summation, the Law Guardian appears to suggest that, if the court were inclined to continue to compel visitation, then respondent mother should be ordered to attend as well. First, as stated above, there is simply no evidence at this trial that the children are particularly anxious to pursue a relationship with the petitioners at this time. To the contrary, each of the children expressed to their individual therapists that they do not want to be forced to visit with petitioners for several reasons including that the Poppes remind them of their “old parents.” However, even if the children were pressing to visit, adding respondent mother to the visit is not a practical alternative given the deterioration in the relationship between these parties which has only worsened during these years of litigation. (See Matter of Emanuel S., 78 NY2d 178 [1991].)
Last, both Dr. L. and Ms. K. stress that respondent mother has not encouraged the children to pursue a relationship with the Poppes, or otherwise, has not given these children “psychological permission” to visit with their grandparents due to her own mental health issues or her own unconscious fears associated with the Poppes. Even assuming this is true, these are not issues that can be meaningfully addressed by court order or the *952 filing of violation petitions. Indeed, when this court ordered respondent mother not to be present at the court-ordered visits, the children became terrified and their symptoms intensified. Whether respondent mother can ever become comfortable with the children having a meaningful relationship with their paternal grandparents may be determined perhaps only by the passage of time and the progress made by the children and the respondent mother in therapy.
While it remains the hope of this court that the children will one day seek a healthy, substantive relationship with the Poppes, the evidence at trial proves that it is no longer in their best interests to continue to order them to pursue that relationship at this time. Accordingly, the Poppes’ petitions are dismissed and respondent mother’s cross petition is granted.